UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Elizabeth E. Brown

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DARRYL LAMAR DAGEN, | ) | Case No: 05-19733 EEB |
| | ) | Chapter 13 |
| Debtor. | ) | |

**ORDER**

THIS MATTER comes before the Court on the Debtor's "Emergency Motion for Sanctions" ("Motion"), his "Emergency Motion for Inclusion of New Matter," the Response in opposition, filed by his ex-wife, Masako Kuragano-Dagen ("Mrs. Dagen"), and each of their supporting briefs. In these filings, the parties do not dispute that Mrs. Dagen informed state authorities of the source of the Debtor's present disability income, resulting in its garnishment for both post-confirmation support obligations and past due arrearages. Their dispute raises the question of whether a Chapter 13 debtor's post-confirmation income is protected from the collection efforts of a domestic support creditor.

**I.      Background**

The Debtor and Mrs. Dagen have been embroiled in a protracted divorce proceeding in Pennsylvania, which began in 2002, and which has since spilled over into the bankruptcy court. Debtor filed his Chapter 13 petition on April 26, 2005.[1] He listed his former spouse on his initial list of creditors and scheduled a past due support obligation owed to her as a priority unsecured debt in the amount of $18,000.

Thereafter the Debtor proceeded toward confirmation of a plan of reorganization. The Court's record shows that, with the filing of his initial plan and subsequent amended plans, the Debtor gave the required notices to Mrs. Dagen. His initial plan drew an objection only from the Chapter 13 trustee. Before a hearing on the trustee's objection, the Debtor filed his first amended plan. This time he drew an objection from Mrs. Dagen only.[2] Before Mrs. Dagen's objection came before the Court for a hearing, the Debtor filed a second amended plan on

---

[1]     This case was filed before October 15, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") became effective. Thus, this case is governed by the law in effect prior to BAPCPA and all statutory references to the Bankruptcy Code are to 11 U.S.C. § § 101-1330 (2004), unless otherwise specified.

[2]     Pursuant to Local Rule 320(c)(4), which was added by General Procedure Order 2004-3, all objections to prior plans are deemed withdrawn, unless they are reasserted following the filing of an amended plan. Thus, the Court deemed the trustee's prior objection withdrawn.

November 29, 2005 (the "Plan"). Apparently the third time was a charm, because it drew no further objections from anyone. Since no one objected to the second amended plan, and based on the representations of the Debtor as to compliance with the requirements of § 1325, the Court entered its Order of January 20, 2006 confirming the Plan.

In his confirmed Plan, he specifically provided for his past due child support obligations as a priority debt. Mrs. Dagen had filed a timely proof of claim in this case, asserting a priority unsecured claim for child support arrearages in the amount of $18,803.52, based on a court order, dated March 31, 2005. She also filed a general unsecured claim in the amount of $26,000 for attorney's fees awarded pursuant to a court order, dated November 1, 2004. The Debtor's Plan provided for the priority treatment of his support obligation in the amount of $18,804. Section III, paragraph A.5. of the Plan states: "Debtor owes past due support to Mrs. Dagen in the total amount of $18,804 that will be paid as follows: Distributed by the Trustee pursuant to the terms of the Plan." The Plan did not specifically mention the unsecured non-priority claim, but it was presumably included in the class of general unsecured debts. Section V of the Plan further provided, in pertinent part, that "[a]ll Property of the estate shall vest in the debtor at the time of confirmation of this Plan." The Court's Order of January 20, 2006 confirmed the Plan as proposed, without any modification regarding vesting of property of the estate or otherwise.

Following confirmation, Mrs. Dagen obtained limited relief from the automatic stay to proceed in the divorce court. The Court granted partial relief, allowing her to seek an order dividing marital property. The relief from stay order specifically provided that Mrs. Dagen could not seek to collect any debt arising from the property division, or seek to collect on a contempt order related to unpaid pre-petition support. This Court's ruling further recognized that the automatic stay did not apply to requests to establish or modify awards for alimony or maintenance. This Order was affirmed on appeal by the district court on March 28, 2007.

In the instant Motions, the Debtor contends that Mrs. Dagen has improperly attempted to collect support payments from his disability income in violation of the automatic stay and his confirmed Chapter 13 plan. At the August 30, 2007 show cause hearing, Mrs. Dagen's counsel initially denied attempts to collect pre-petition support, but later clarified that Mrs. Dagen had notified the divorce court/child support enforcement agency of the name of the insurance company making disability payments to the Debtor. As a result, funds were garnished from Debtor's disability check for one month. Mrs. Dagen's brief states that the wage attachment against the disability benefits issued by the Court of Common Pleas was for the sum of $894.20 per month for current (post-confirmation) support and $192.10 per month for past due support, for a total of $1,086.30. The Court ordered Mrs. Dagen's counsel to contact the child support enforcement agency to inform them that all garnishments for support were to cease pending a final order by this Court. Since there have been no further complaints alleging continuing collection activities, the Court presumes that counsel complied with its directive.

**II.     Discussion**

The Debtor asks the Court to hold Mrs. Dagen in contempt for violating the automatic stay.  Mrs. Dagen responds that collection of support obligations are excepted from the scope of the automatic stay.  Resolving this dispute requires the Court to consider the interplay of several Code provisions.  In particular, the Court must determine whether post-confirmation income continues to be protected by the stay.  Courts differ on this issue.  This Court adopts the more restrictive view, known as the "estate termination" approach, that holds that confirmation vests all property, including post-confirmation income necessary to fund the plan, in the Debtor.  Because vesting causes the income to cease being "property of the estate," it no longer enjoys the protection of the stay as to support obligations.  As a result, Mrs. Dagen's ability to reach post-confirmation income depends only on whether her claims are covered by the Plan.  The answer to this question differs depending on whether the debt arose prepetition or post-petition.

   **A.     Prepetition Child Support Debt**

       **1.     Automatic Stay Prevents Collection of Prepetition Debts Generally**

Section 362(a) throws a broad blanket of protection over a debtor and property of the estate.  Among other things, it prevents the enforcement of Mrs. Dagen's pre-bankruptcy judgments against either the Debtor or property of the estate.  11 U.S.C. § 362(a)(2).  It includes any act to collect a prepetition claim against the Debtor.  11 U.S.C. § 362(a)(6).  And it covers "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

       **2.     Limited Exception for Collection of Support Debts:  Support Creditor can Continue to Collect from Property that is not "Property of the Estate"**

Section 362(b) provides an exception to the automatic stay for certain actions related to support obligations.  It states in pertinent part that:

> The filing of a petition  . . . does not operate as a stay –
>> . . . .
>> (2) under subsection (a) of this section–
>>> (A) of the commencement or continuation of an action or proceeding for–
>>>> . . . .
>>>> (ii) the establishment or modification of an order for alimony, maintenance, or support; or
>>> (B) of the collection of alimony, maintenance, or support from property that is not property of the estate;

Thus, § 362(b) allows Mrs. Dagen to continue to collect support, but not from "property of the

3

estate."

### 3. Definition of "Property of the Estate"

Section 541(a)(1) defines "property of the estate" very broadly to encompass "all legal or equitable interests of the debtor in property as of the commencement of the case." Section 1306(a) defines it even more broadly in a Chapter 13 case to include:

> (1) all property of the kind specified in [ § 541] that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first; and
>
> (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first.

At first blush, it would appear from the interplay of § 362(b) and § 1306(a) alone that Mrs. Dagen cannot attempt to collect from the Debtor's post-petition income.

### 4. Property can Lose its Status as "Property of the Estate" as a Result of Property Vesting Under a Confirmed Plan

But "property of the estate" may lose its status as such under a number of circumstances. In the context of a Chapter 13 case, post-petition income loses this status on confirmation of the plan. Section 1327(b) states that "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." In Section V of his Plan, the Debtor expressly provided that "[a]ll Property of the estate shall vest in the debtor at the time of confirmation of this Plan." Nothing in the Court's Order confirming the Plan provided otherwise. As a result, upon confirmation, property of the estate ceased to exist. The Debtor's income became property of the Debtor once again.

The Court acknowledges a split of authority on the question of whether post-petition income ceases to be property of the estate at confirmation. Some courts hold that all property of the estate remains property of the estate until the entry of discharge, dismissal or conversion (the "estate preservation approach"). *See*, *e.g., Security Bank of Marshalltown v. Neiman*, 1 F.3d 687 (8th Cir. 1993). Others conclude that property of the estate in existence at the time of confirmation vests in the debtor, but that the estate continues to exist post-confirmation and is funded thereafter by the debtor's regular income and post-petition assets (the "modified estate preservation approach"). *See, e.g., Barbosa v. Soloman*, 235 F.3d 31 (1st Cir. 2000). According to the "estate transformation approach," only the amount of property necessary for execution of the plan remains property of the estate after confirmation. *See*, *e.g., Black v. United States Postal Serv. (In re Heath)*, 115 F.3d 521 (7th Cir. 1997). Finally, courts adopting the "estate termination approach" hold that the confirmation order terminates the estate altogether, re-vesting all property of the estate in the debtor. *Oliver v. Toth (In re Toth)*, 193 B.R. 992 (Bank.

4

N.D. Ga. 1996); *In re Petruccelli*, 113 B.R. 5 (Bankr. S.D. Cal. 1990). Neither the Tenth Circuit nor the Tenth Circuit Bankruptcy Appellate Panel have yet addressed this issue. In *In re Talbot*, 124 F.3d 1201, 1207 (10th Cir. 1997), the Tenth Circuit acknowledged the issue, but found it unnecessary to resolve it in that case. Likewise, in *In re Vannordstrand*, 356 B.R. 788 (Table), 2007 WL 283076 (10th Cir. BAP 2007)(unpublished table decision), the BAP recognized the issue, but did not reach it because the terms of the plan before it provided that property did not vest in the debtor on confirmation.

In the absence of a clear Tenth Circuit precedent to the contrary, this Court finds that only the estate termination approach gives effect to the literal terms of § 1327(b), which expressly states that confirmation vests all property in the debtor. The other approaches seek to preserve the estate for the purpose of effectuating the plan. But they fail to recognize that it is § 362(c)(2), as described more fully below, that provides the continued protection against efforts to collect on *prepetition* debts. These same protections are not available to enjoin efforts to collect on post-petition debts. In fact, the actions prohibited by the stay in § 362(a) apply only to actions taken in connection with prepetition debts.

### 5. Despite Loss of Status, Prepetition Creditors Generally Remain Stayed from Collection Efforts

Once the Debtor's income lost its status as "property of the estate," it lost the protection of the automatic stay given to "property of the estate." Section 362(c)(1) states that "the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate."

But despite this loss in status, it continued to enjoy the protection of the automatic stay as to most prepetition debts. According to § 362(c)(2), the automatic stay continues to prevent the collection of prepetition debts described in § 362(a) in a Chapter 13 case for a period of time:

> (2) the stay of any other act under subsection (a) of this section continues until the earliest of –
> (A) the time the case is closed;
> (B) the time the case is dismissed; or
> (C) if the case is . . . a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied.

11 U.S.C. § 362(c)(2). A discharge will not enter in a Chapter 13 case until the debtor has fully performed his plan obligations. 11 U.S.C. § 1328(a). Most prepetition creditors continue to be prevented from their collection efforts during the pendency of the plan by virtue of this section. On successful completion of a plan, the debtor's discharge then substitutes for the automatic stay, by enjoining collection activity as to any debts that have been discharged under the plan. 11 U.S.C. § 1328(c). Thus, even though the Debtor's post-confirmation income lost its status as property of the estate on confirmation, the automatic stay continues during the life of the Plan to prevent the collection of most pre-petition debts prohibited by § 362(a).

### 6. Automatic Stay in Chapter 13 Does not Apply to Support Creditors

This general provision of continued coverage of the automatic stay does not apply to domestic support obligations. The terms of § 362(b)(2) expressly except support debts from the scope of the automatic stay once the property loses its status as "property of the estate." Thus, § 362(c)(2)'s continued stay of acts prohibited under § 362(a) is ineffective to prevent a collection effort expressly authorized by § 362(b). Section 362(b)(2) prevents collection of support debts only as to "property of the estate." Loss of this status on confirmation then triggered the loss of the stay as to the Debtor's post-confirmation income.

### 7. Confirmed Plan, not Automatic Stay, Prohibits Support Creditors from Collecting Prepetition Debts

Following confirmation, the ability of a support creditor to continue to collect a prepetition debt is only limited to the extent that the confirmed plan abrogates these rights. According to § 1327(a), "[t]he provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." Once confirmed, it was the Plan, not the automatic stay, that halted any further attempt to collect the prepetition debt. By the terms of the Plan, Mrs. Dagen was contractually obligated to accept distributions from the Chapter 13 trustee in satisfaction of her prepetition claims.

## B.  Post-petition Child Support Debt & Post-Confirmation Collection Activity

### 1. Debtor's Plan Does Not Cover Any Post-Petition Support Debt

While the Debtor's Plan covers his prepetition support debts, it makes no provision for his post-petition obligations. The Debtor's Schedule I reflects a payroll deduction of $644 for child support, and the Debtor's brief assumes that he remains obligated during his commitment period to pay $644 per month. In his brief, he explains that this $644 is comprised of $200 for past due support and $400 for current and future support. He objects only to the divorce court's increase of the current support obligation.[3] It appears to this Court that the Debtor is laboring under a misunderstanding that he is obligated under his Plan, and that he is actually paying, $644 per month for support obligations, to cover both present and past due support. This may have been the result the Debtor intended, but it is not what his Plan provides.

The Debtor's Plan is the typical "pot plan," commonly filed in this district. It commits the Debtor to make a specific number of payments during the Plan's commitment period in specified amounts. In this case, Section II.A.1. of his Plan provides for payment of:

---

[3]   The divorce court increased his support from $400 to $894.10, and added $192.10 to it for past due arrearages, for a total monthly figure of $1,086.30.

>Future earnings of $50 per month for months 1-3 & $392 per month for month 4 & $0.00 for months 5&6 & $407.00 per month for months 7-60 which shall be paid to the trustee for a period of approximately 60 months, beginning 6/15/2005.

If all of these payments are made, the Debtor will have contributed $22,520 into his "pot." From this pot, the trustee will pay his priority creditors first. He has listed bankruptcy attorney's fees of $1,250 and Mrs. Dagen's support arrearage claim of $18,804 to be paid as priority claims. Once these debts are fully retired, then the rest of his pot will go towards payment of his *prepetition* general unsecured claims (Class 4 in his Plan), such as his pre-bankruptcy medical bills and Mrs. Dagen's attorney's fee award of $26,000. The amount left in the pot will be insufficient to retire prepetiton debts, scheduled at greater than $100,000, but each creditor in this class will receive its *pro rata* share of the remaining funds. To the extent these prepetition debts are dischargeable debts, the balance left unpaid will be discharged when his Plan is completed.[4]

None of these funds, however, will be paid to Mrs. Dagen on account of his current support obligations. The divorce court's modified award of $894.20 per month for current support continues to accrue each month. Unless the Debtor has been making payments to Mrs. Dagen, separate and apart from his Plan payments, she has received no funds towards this obligation.

As the Debtor's brief acknowledges, § 362(b)(2) allowed Mrs. Dagen to return to the divorce court to seek an increase in child support. The Debtor may not like the result that occurred in state court, but he is bound by it. The only place he can seek relief from the accrual of this debt is in the state court system, including an appeal in state court if he does not believe the divorce court's rulings are proper. This Court is without authority to usurp the divorce court's role. It can only halt the collection actions on prepetition debts during the life of the Plan.

### 2.  Neither Plan Nor Automatic Stay Prevents Post-Confirmation Collection Efforts of Support Creditor for Post-Petition Support Debt

Since the Plan does not apply to the Debtor's post-petition support obligations, it does not prevent Mrs. Dagen's efforts to collect post-petition debt. The automatic stay prevented her from collecting post-petition support debt from the Debtor's post-bankruptcy income, but only until the confirmation of the plan. Once the Court confirmed the Plan, all of his future income ceased to be property of the estate and instead vested in the Debtor. Section 362(c)(2) continued to protect it from his other prepetition creditors. But § 362(b) expressly excepted Mrs. Dagen's claim from § 362(c)(2)'s coverage. As a result, she is free to collect post-petition support debt

---

[4] At best, § 1328(a) only discharges the debts "provided for by the plan." This means his *prepetition* debts. Section 1305 allows a debtor, under certain circumstances, to treat post-petition debts as prepetition debts, but this section is not applicable to the present case as no such claims were filed or included in his Plan.

7

from the Debtor's post-confirmation income.

### III. Conclusion

For the foregoing reasons, the Debtor's Emergency Motion for Sanctions is GRANTED in part and DENIED in part. Mrs. Dagen did not violate the automatic stay by garnishing the Debtor's post-confirmation disability income. It is the Plan, not the automatic stay, that prevents her from attempting to collect her *prepetition* debts from any source, other than receiving her distributions from the Chapter 13 trustee. But neither the Plan nor the automatic stay prevent her post-confirmation efforts to collect *post-petition* support. Consequently, Mrs. Dagen was not prohibited from garnishing $894.20 from his disability income. But she must either disgorge $192.10, representing funds garnished for payment of prepetition support debt, or apply it towards the Debtor's other post-petition obligations. The Court's June 11, 2007 Order to Show Cause is otherwise deemed fully satisfied.

Done and entered this 26th day of March, 2008.

BY THE COURT:

_____
Elizabeth E. Brown,
United States Bankruptcy Judge